UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
[TRENTON DIVISION]
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

770306
PHELAN HALLINAN DIAMOND & JONES, PC
400 Fellowship Road, Suite 100
Mt. Laurel, NJ 08054
856-813-5500
Attorneys for WELLS FARGO BANK, N.A.

| | |
|---|---|
| In Re: | Case No: 16-11312 - KCF |
| CHRISTINE B SHEEHAN | Hearing Date: 07/12/2016 |
| RAFAEL C AGLIATA | Judge: KATHRYN C. FERGUSON |
| | Chapter: 7 |

# CERTIFICATION OF PARTICIPANT
## REGARDING MOTION FOR RELIEF

I HEREBY CERTIFY that with respect to the copy of the captioned Motion for Relief submitted to the Court, the following conditions have been met:

(a)   The Affiant has acknowledged the genuineness of the original signature;

(b)   The original document was executed in completed form prior to facsimile transmission;

(c)   The document or a copy with an original signature affixed to it will be obtained by the Participant within seven business days after the date the document or pleading with the facsimile signature was electronically filed with the Court; and

(d)   In accordance with the Court's *Administrative Procedures for Filing, Signing, and Verifying Documents by Electronic Means* (collectively, the "Administrative Procedures"), at paragraph II C.2, the document containing the original signature will be maintained in paper form by the Participant for a period not less than seven years from the date of closure of the case or proceeding in which the document is filed; and that upon required the original document must be provided to other parties or the Court for review.

/s/ John Schneider
John Schneider, Esq.
Phelan Hallinan Diamond & Jones, PC
400 Fellowship Road, Suite 100
Mt. Laurel, NJ 08054
Tel: 856-813-5500 Ext. 7367
Fax: 856-813-5501
Email: john.schneider@phelanhallinan.com

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
[TRENTON DIVISION]
**Caption in Compliance with D.N.J. LBR 9004-1(b)**

770306
PHELAN HALLINAN DIAMOND & JONES, PC
400 Fellowship Road, Suite 100
Mt. Laurel, NJ 08054
856-813-5500
Attorneys for WELLS FARGO BANK, N.A.

| | |
|---|---|
| In Re:<br><br>CHRISTINE B SHEEHAN<br>RAFAEL C AGLIATA | Case No:  16-11312 - KCF<br><br>Hearing Date: 07/12/2016<br><br>Judge:  KATHRYN C. FERGUSON<br><br>Chapter:  7 |

**CERTIFICATION OF John Schneider, Esq., ATTORNEY FOR WELLS FARGO BANK,
N.A., REGARDING CALCULATION OF AMOUNT DUE
(NOTE AND MORTGAGE DATED 12/23/2003)**

John Schneider, Esq., attorney for WELLS FARGO BANK, N.A., hereby certifies the following:

Recorded on December 30, 2003, in MERCER County, in Book 08469, Page 0435

Property Address: 44 MARTIN LANE, HAMILTON, NJ 08619

Mortgage Holder:  WELLS FARGO BANK, N.A.

**I. PAYOFF STATEMENT*****

| | |
|---|---|
| Unpaid Principal Balance | $ 266,959.09 |
| Accrued Interest from 12/01/2012 to 04/16/2015 | $ 18,557.65 |
| (Interest rate = Variable per year, $N/A per day x N/A days) | |
| Unearned interest from N/A to N/A: | $ 0.00 |
| Per diem interest from N/A to N/A: | $ 0.00 |

Late Charges from 01/01/2013 to 09/12/2013 (71.27 /mo. X 3 mos.) ............ $ 213.81

Attorney's fees and costs as of  08/28/2015                    :                   $ 3,268.90

Advances through    04/16/2015                            for:

      Real Estate Taxes:                                            $ 22,464.04

      Insurance Premiums:                                        $ 4,180.00

      Other:                                                            $ 0.00

      ***Sub-Total of Advances:***                                $ 26,644.04

      Less Escrow Monies:                                        ($ 485.00)

      ***Net Advances:***                                            $ 26,159.04


Interest on advances from N/A to N/A:                            $ 0.00

Other charges (specify)                                            $ 0.00

Less unearned interest                                            ($ 0.00                    )

      **TOTAL DUE AS OF 08/28/2015:**                    $315,158.49

      **Date of last payment 12/23/2012**


## II. EQUITY ANALYSIS (When appropriate)


Estimated fair market value of real estate as of 03/17/2016:        $  385,000.00                    *

*Source: BPO (e.g. appraisal, tax bill/assessment, contract of sale, debtor's schedules, etc.)

Liens on the real estate:

    1.  Real estate taxes as of 04/16/2015:                    $  22,464.04

    2.  First Mortgage (principal and interest), as of  04/16/2015:        $  285,516.74

    3.  Second Mortgage (principal and interest), as of 01/26/2016:    $  247,368.00

    4.  Other (10% Cost of Sale):                                $  38,500.00

**TOTAL LIENS**:

                                               ($593,848.78)

**APPARENT EQUITY AS OF 03/17/2016:**

                                    $0.00                            **

**If negative, insert zero (0)
*** Payoff figures calculated using Exhibits A, B, and C.


I certify under penalty of perjury that the foregoing is true and correct.


Dated: June 10, 2016

/s/ John Schneider
John Schneider, Esq.
Phelan Hallinan Diamond & Jones, PC
400 Fellowship Road, Suite 100
Mt. Laurel, NJ 08054
Tel: 856-813-5500 Ext. 7367
Fax: 856-813-5501
Email: john.schneider@phelanhallinan.com

## Exhibit A

**152845**
**PHELAN HALLINAN DIAMOND & JONES, PC**
400 Fellowship Road Suite 100
Mt. Laurel, NJ 08054
856-813-5500
Attorney for Plaintiff

| | |
|---|---|
| WELLS FARGO BANK, N.A.<br>    PLAINTIFF | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>MERCER COUNTY |
| | DOCKET NO: F-032418-13 |
| CHRISTINE B. SHEEHAN, ET AL.<br>    DEFENDANT (S) | CIVIL ACTION<br>FINAL JUDGMENT |

This matter having been opened to the Court by Phelan Hallinan Diamond & Jones, PC attorney's for plaintiff, and it appearing that service of the Summons and Complaint has/have been made upon the defendants, in accordance with the Rules of this Court and default having been entered against all non-answering defendants;and it further appearing that the Summons Notice and Complaint (Amendment if any) have been duly issued and returned served upon the following defendant, CHRISTINE B. SHEEHAN and RAFAEL AGLIATA, who has filed an answer, which has been stricken or withdrawn of record and default entered by the Court's Order dated May 19,2014; and plaintiff's obligation, Mortgage and assignment of Mortgage having been presented and marked as exhibits by the Court, and proof having been submitted of the amount due on the plaintiff's Mortgage and sufficient cause appearing:

It is on this    28th    day of    August    20 15 ORDERED and ADJUDGED that the plaintiff is entitled to have the sum of $311,889.59 together with lawful interest from April 16, 2015 together with costs of this suit to be taxed including counsel fee of $ 3,268.90 raised and paid in the first place out of the mortgaged premises and it is further ordered that the plaintiff, its assignee or purchaser at sale recover against the following defendants:

**CHRISTINE B. SHEEHAN**

## RAFAEL AGLIATA

and all parties holding under said defendants the possession of the premises so mentioned and described in the said Complaint with the appurtenances; and it is further

ORDERED and ADJUDGED that the mortgaged premises be sold to raise and satisfy the several sums of money due, in the first place to the plaintiff, WELLS FARGO BANK, N.A., in the sum of $311,889.59 together with lawful interest thereon to be computed as aforesaid, the plaintiff's costs to be taxed, with interest thereon, and that an execution for the purpose be duly issued out of this Court directed to the Sheriff of MERCER County, commanding said Sheriff to make sale according to law of the mortgaged premises, as described in the Complaint, and out of the money arising from said sale, that said Sheriff pay in the first place, to the plaintiff, said plaintiff's debt, with interest thereon as aforesaid and said plaintiff's costs with interest thereon as aforesaid, and in case more money shall be realized by the said sale than shall be sufficient to satisfy such several payments as aforesaid, that such surplus be brought into this Court to abide the further Order of this Court and that the Sheriff aforesaid make a report of the aforesaid sale without delay as required by the rules of this Court, and it is further

ORDERED and ADJUDGED that the defendants in this cause, and each of them stand absolutely debarred and foreclosed of and from all equity of redemption of, in and to said mortgaged premises described in the Complaint, when sold as aforesaid by virtue of this judgment.

This judgment shall not affect the right of any person protected by the provisions of the New Jersey Tenant Anti-Eviction Statute (NJSA 2A: 18-61.1 et seq.).

Respectfully Recommended
R. 1:34-6 OFFICE OF FORECLOSURE

**<u>Exhibit B</u>**

RECEIVED    Thursday 6/25/2015 11:08:31 AM 1361035A
Received in the Office of
the Superior Court Clerk
Writ #024630-15

152845
**PHELAN HALLINAN DIAMOND & JONES, PC**
Justin M. Schiff, Esq. ID No. 143392015
400 Fellowship Road Suite 100
Mt. Laurel, NJ 08054
856-813-5500
Attorney for Plaintiff

| | |
|---|---|
| WELLS FARGO BANK, N.A.<br>   PLAINTIFF | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>MERCER COUNTY |
| | DOCKET NO: F-032418-13 |
| CHRISTINE B. SHEEHAN, ET AL.<br>   DEFENDANT (S) | CIVIL ACTION<br>WRIT OF EXECUTION |

The State of New Jersey

To the Sheriff of the County of MERCER

GREETINGS

Whereas, on the following date,                8/28/15                by certain

judgment in or Superior Court of New Jersey, in a certain cause therein pending, wherein the

plaintiff is the WELLS FARGO BANK, N.A. and the following named parties are the defendants:

**CHRISTINE B. SHEEHAN;**

**RAFAEL AGLIATA;**

**PNC BANK, NATIONAL ASSOCIATION;**

**CKC SOUTH LLC;**

**STATE OF NEW JERSEY;**

**GARY WILLIAMS, ASSIGNEE;**

**BRAD WILLIAMS, ASSIGNEE**

it was ordered and adjudged that certain mortgaged premises, with the appurtenances, in the

Complaint in the said cause particularly set forth and described that is to say:

The mortgaged premises are described as set forth upon the RIDER ANNEXED HERETO

AND MADE A PART HEREOF.

Together with all and singular the rights, liberties, privileges, hereditaments and appurtenances there unto belonging or in anywise appertaining, and the reversion and remainders, rents, issues and profits thereof, and also all the estate, right, title, use, property, claim and demand of the said defendants of, in, to and out of the same, to be sold, to pay and satisfy in the first place unto plaintiff, WELLS FARGO BANK, N.A., the sum of $311,889.59 being principal, interest and advances secured by a certain Mortgage dated December 23, 2003 and given by CHRISTINE B. SHEEHAN and RAFAEL AGLIATA with lawful interest from April 16, 2015 until the same is paid and satisfied and also the costs of the aforesaid plaintiff, with interest thereon.

And for that purpose a Writ of Execution should issue, directed to the Sheriff of the County of MERCER commanding him/her to make sale as aforesaid; and that the surplus money arising from such sale, if any there be, should be brought into our said Court, subject to further order of said Court, as by the said judgment remaining as of record in our said Superior Court of New Jersey, at Trenton, doth and may more fully appear; and whereas, the costs of the said plaintiff have been duly taxed at the following sum: $  4,151.90          .

Therefore, you are hereby commanded that your cause to be made of the premises aforesaid, by selling so much of the same as may be needful and necessary for the purpose, the said sum of $311,889.59 and the same you do pay to the said plaintiff together with contract and lawful interest thereon, as aforesaid, and the sum aforesaid of costs with lawful interest thereon and that you have the surplus money, if any there be, before our said Superior Court of New Jersey, aforesaid at Trenton, within thirty (30) days after sale pursuant to R. 4:59-1(1), to abide the further order of the said court, according to judgment aforesaid, and you are to make return at the time and place aforesaid, by certificate under your hand, of the manner in which you have executed this our Writ, together with this Writ and if no sale this Writ shall be returnable within 24 months.

Witness the Honorable Paul Innes, P.J.Ch. of the Superior Court at Trenton aforesaid, this  **28th**

day of  **August**               20 **15**

/s/ Justin M. Schiff
Justin M. Schiff, Esq.
Attorney for Plaintiff

**MICHELLE M. SMITH,  ESQ.**
**Clerk of Superior Court**

_____
**Michelle M. Smith, Clerk**
of the Superior Court



All that certain lot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Township of Hamilton, County of Mercer, State of New Jersey:

Beginning at a point along the northerly line of Martin Lane, northwesterly 716.98' from the northerly terminus of a 35.36' long line connecting the easterly line of Jenny Jump Road with the northerly line of Martin Lane and thence,

1. Along the northerly line of Martin Lane, curving to the left, in a westerly direction, having a radius of 715.00' and an arc length of 109.13' to an iron cap and thence,

2. N. 12 degrees 56 minutes 32 seconds W. 130.51' to an iron cap and thence,

3. N. 77 degrees 13 minutes 59 seconds E, 130.00' to an iron cap and thence,

4. S. 04 degrees 11 minutes 50 seconds E. 140.05' to the point or place of beginning.

The above described lands are known as Lot 13 in Block 1565 as shown on the current Official tax Maps of the Township of Hamilton, Premises also Shown on a certain map entitled "Final Plat Portion of Lot 11, Section 8" filed in the Mercer County Clerk's Office on 9/24/1985 as Map No. 2718-C.

Premises more commonly known as 44 Martin Lane.

The above description is in accordance with a survey prepared by Brunswick Surveying, Inc. dated 12/23/2003 in File No. 3783-03.

# Exhibit A

**Exhibit C**

152845
**PHELAN HALLINAN DIAMOND & JONES, PC**
400 Fellowship Road, Suite 100
Mt. Laurel, NJ 08054
(856) 813-5500
Attorneys for Plaintiff

| WELLS FARGO BANK, N.A. PLAINTIFF | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION MERCER COUNTY |
|---|---|
| VS. | DOCKET NO: F-032418-13 |
| CHRISTINE B. SHEEHAN, ET AL. DEFENDANT (S) | CIVIL ACTION CERTIFICATION OF PROOF OF AMOUNT DUE AND SCHEDULE |

Jorge J. Medina Hernandez, of full age, hereby states:

1.    I, Jorge J. Medina Hernandez, am employed by the plaintiff at its Charlotte, North Carolina office as a Vice President Loan Documentation. In the regular performance of my job functions, I am familiar with business records maintained by Wells Fargo Bank, N.A. (hereinafter "Wells Fargo") for the purpose of servicing mortgage loans. These records (which include data compilations, electronically imaged documents and others) are kept in the course of business activity conducted by Wells Fargo. In connection with making this certification, I have acquired personal knowledge of the matters stated herein by personally examining the business records relating to the subject mortgage loan. I am authorized to make this certification on behalf of the plaintiff.

2.    I have reviewed Wells Fargo's books and business records concerning the Promissory Note and Mortgage loan described in the plaintiff's complaint. These books and records are maintained by Wells Fargo in the course of its regularly conducted business activities and are made at or near the time of the event, by or from information transmitted by a person with knowledge. It is the regular practice to keep such records in the ordinary course of a regularly conducted business activity.

3.    Said books and business records indicate that the default of the defendant(s)-borrower(s), remains uncured and there is due to the plaintiff in this action the sum of $311,889.59, as set forth in the Proof of Amount Schedule annexed hereto. I have reviewed all entries and calculations, and they are correct.

001-NJ-V5

4.      Wells Fargo Bank, N.A., directly or through an agent, has possession of the Promissory Note.
Wells Fargo Bank, N.A. is either the original payee of the Promissory Note or the Promissory Note has been duly
indorsed.

5.      I understand that the court will rely upon this certification in support of the plaintiff's application
for a foreclosure judgment in the within action.


I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made
by me are willfully false, I am subject to punishment.


Date: 04/17/2015

*Jorge J. Medina Hernandez*

Jorge J. Medina Hernandez

Vice President Loan Documentation

Wells Fargo Bank, N.A.

## AMOUNT DUE SCHEDULE

NOTE AND MORTGAGE DATED December 23, 2003

Recorded on December 30, 2003, in MERCER County, in Book 08469 at Page 0435

Property Address:  44 MARTIN LANE, HAMILTON, NJ 08619-1137

Mortgage Holder:  WELLS FARGO BANK, N.A.

## STATEMENT OF AMOUNT DUE

| | |
|---|---:|
| Unpaid Principal Balance as of 04/16/2015 | $266,959.09 |
| Interest from 12/01/2012 to 04/16/2015 | $18,557.65 |
| ** (Interest rate = variable) | |
| Late Charges from 01/01/2013 to 09/12/2013 ($71.27/mo. x 3 mos.) | $213.81 |

Advances through 04/16/2015  for:

| Real Estate Taxes | | $22,464.04 |
|---|---|---|
| 01/27/2015 | $2,869.46 | |
| 12/05/2014 | $414.54 | |
| 10/28/2014 | $2,995.11 | |
| 08/01/2014 | $2,995.12 | |
| 04/16/2014 | $2,743.79 | |
| 01/27/2014 | $2,743.79 | |
| 11/07/2013 | $321.84 | |
| 10/28/2013 | $2,769.53 | |
| 08/19/2013 | ($600.00) | |
| 07/30/2013 | $2,769.54 | |
| 04/16/2013 | $2,441.32 | |

| | |
|---|---|
| Home Owners Insurance Premiums | $4,180.00 |
| Mortgage Insurance Premiums | $0.00 |
| Inspections | $0.00 |
| Winterizing/Securing/Property Preservation | $0.00 |
| **Sub-total of Advances** | $26,644.04 |
| **Credits to Borrower** | ($485.00) |

001-NJ-V5

| | |
|---|---|
| **Net Advances** | $26,159.04 |
| Interest on Advances from 00/00/0000 to 00/00/0000 | $0.00 |
| Other Charges or Credits (specify): | $0.00 |
| **Total Due as of** 04/16/2015 | $311,889.59 |

** See attached Schedule 1 to Attachment A

Dated: 04/17/2015

*Jorge J. Medina Hernandez*

Jorge J. Medina Hernandez

Vice President Loan Documentation

Wells Fargo Bank, N.A.

Surplus money: If after the sale and satisfaction of the mortgage debt including costs and expenses, there remains any surplus money, the money will be deposited into the Superior Court Trust Fund and any person claiming the surplus or any part thereof, may file a motion pursuant to Court Rules 4:64-3 and 4:57-2 stating the nature and extent of that person's claim and asking for an order directing payment of the surplus money. The Sheriff or other person conducting the sale will have information regarding the surplus, if any.

**Attachment A**

12/01/2012   2.875%

01/01/2013   3.000%

01/01/2014   2.875%

# FIXED/ADJUSTABLE RATE NOTE

### (One-Year Treasury Index - Rate Caps)

**THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

DECEMBER 23, 2003                    NEW BRUNSWICK                    NEW JERSEY
[Date]                                           [City]                                          [State]

44 MARTIN LANE, HAMILTON, NJ  08619

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ *****322,000.00          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **WELLS FARGO HOME MORTGAGE, INC.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **5.375**                    %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **FEBRUARY 01, 2004**                    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **JANUARY 01, 2034**          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **WELLS FARGO HOME MORTGAGE, INC., P.O. BOX 10304, DES MOINES, IA 503060304**
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ **\*1,803.11**              . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of **JANUARY, 2011**          , and the adjustable interest rate I will pay may change on that day every 12th month thereafter.

MULTISTATE FIXED/ADJUSTABLE RATE NOTE - ONE-YEAR TREASURY INDEX - Single Family - Fannie Mae UNIFORM INSTRUMENT



The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND THREE-QUARTERS** percentage points ( **2.750** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.375** % or less than **2.750** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **10.375** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15**              calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   **5.000**             % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Form 3522 1/01
Initials:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section  4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.



WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
RAFAEL AGLIATA                    -Borrower

_____ (Seal)
CHRISTINE B SHEEHAN               -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

                                  [Sign Original Only]

WITHOUT RECOURSE
PAY TO THE ORDER OF

WELLS FARGO HOME MORTGAGE, INC.
By_____
        Joan M. Mills, Vice President

Mercer County Clerk's Office

Return To:

    WELLS FARGO HOME MORTGAGE INC
    3601 MINNESOTA DRIVE
    SUITE 200
    BLOOMINGTON MN 55435

Index    MORTGAGE BOOK

Book    08469    Page    0435

No. Pages    0021

Instrument    MORTGAGES

Date :    12/30/2003

Time :    2:39:52

Control #    200312300668

INST#    RD 2003 082275

AGLIATA
RAFAEL
WELLS FARGO HOME MTG INC

Employee ID    ANNB

| | | |
|---|---|---|
| RECORDING | $ | 53.00 |
| RECORDING | $ | 67.00 |
| DARM $3 | $ | 60.00 |
| NJPRPA | $ | 40.00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| | $ | .00 |
| Total: | $ | 220.00 |

STATE OF NEW JERSEY
Mercer County Clerk's Office

*********PLEASE NOTE***********************
* DO NOT REMOVE THIS COVER SHEET -        *
*IT CONTAINS ALL RECORDING INFORMATION    *
*******************************************

      Catherine DiCostanzo
      Mercer County Clerk



M084690435

Return To:
WELLS FARGO HOME MORTGAGE, INC.
3601 MINNESOTA DR. SUITE 200
BLOOMINGTON, MN 55435



Prepared By:
WELLS FARGO HOME MORTGAGE, INC.

25 COMMERCE DRIVE, 3RD FLOOR,
CRANFORD, NJ  070163605

——————————————[Space Above This Line For Recording Data]——————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated DECEMBER 23, 2003 ,
together with all Riders to this document.
**(B) "Borrower"** is RAFAEL AGLIATA AND CHRISTINE B SHEEHAN, HUSBAND AND WIFE

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is WELLS FARGO HOME MORTGAGE, INC.

Lender is a CORPORATION
organized and existing under the laws of THE STATE OF CALIFORNIA

**NEW JERSEY** - Single Family - **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**      Form 3031 1/01

VMP®-6(NJ) (0005).01
Page 1 of 15      Initials:
VMP MORTGAGE FORMS - (800)521-7291

Lender's address is **P.O. BOX 10304, DES MOINES, IA   503060304**

Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated **DECEMBER 23, 2003**

The Note states that Borrower owes Lender **THREE HUNDRED TWENTY TWO THOUSAND AND 00/100**                                                                                     Dollars

(U.S. $**\*\*\*\*322,000.00**        ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **JANUARY 01, 2034**

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

Initials: CBS

  -6(NJ) (0005).01                         Page 2 of 15                                         Form 3031 1/01

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For these purposes, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the COUNTY                                                      of MERCER                                            :
             [Type of Recording Jurisdiction]                              [Name of Recording Jurisdiction]
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART THEREOF

*SEE ADJUSTABLE RATE RIDER
THIS IS A PURCHASE MONEY SECURITY INSTRUMENT.
TAX STATEMENTS SHOULD BE SENT TO:  WELLS FARGO HOME MORTGAGE, INC., P.O.
BOX 10304, DES MOINES, IA  503060304

Property Account Number:                              which currently has the address of
44 MARTIN LANE                                                                             [Street]
HAMILTON                               [City], New Jersey 08619          [Zip Code]
("Property Address"):

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
   THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
   UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
   **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this

Initials: _____

-6(NJ) (0005).01                        Page 3 of 15                        Form 3031 1/01

12/23/2003  13:47   732752010

# *Brunswick Surveying, Inc.*

**Land Surveying**
**61 Stelton Road**
**Piscataway, New Jersey 08854**
**Phone (732) 752-0100**
**Fax (732) 752-0101**

Legal Description
N/F Rafael Agliata & Christine B. Sheehan
Block 1565   Lot 13
Hamilton Township-Mercer County, NJ

Beginning at a point along the northerly line of Martin Lane, northwesterly 716.98' from the northerly terminus of a 35.36' long line connecting the easterly line of Jenny Jump Road with the northerly line of Martin Lane and thence,

*1.* Along the northerly line of Martin Lane, curving to the left, in a westerly direction, having a radius of 715.00' and an arc length of 109.13' to an iron cap and thence,

*2.* N. 12 degrees 56 minutes 32 seconds W. 130.51' to an iron cap and thence,

*3.* N. 77 degrees 13 minutes 59 seconds E. 130.00' to an iron cap and thence,

*4.* S. 04 degrees 11 minutes 50 seconds E. 140.05' to the point or place of beginning.

The above described lands are known as Lot 13 in Block 1565 as shown on the current Official Tax Maps of the Township of Hamilton. Premises also shown on a certain map entitled "Final Plat, Portion of Lot 11, Section 8" filed in the Mercer County Clerk's Office on 9/24/1985 as Map No. 2718-C.

Premises more commonly known as 44 Martin Lane.

The above description is in accordance with a survey prepared by Brunswick Surveying, Inc. dated 12/23/2003 in File No. 3783-03.

Robert M. Horvath, NJLS
License #27476

Robert M. Horvath, L.S.
Jay A. Stuhl, Jr., L.S.

# FIXED/ADJUSTABLE RATE RIDER
### (One-Year Treasury Index - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this 23RD    day of **DECEMBER, 2003**    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to
secure Borrower's Fixed/Adjustable Rate Note (the "Note") to
**WELLS FARGO HOME MORTGAGE, INC.**

("Lender") of the same date and covering the property described in the Security Instrument and located at:
**44 MARTIN LANE, HAMILTON, NJ    08619**

[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of **5.375**                %. The Note also
provides for a change in the initial fixed rate to an adjustable interest rate, as follows:
**4.  ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of
**JANUARY, 2011**                  , and the adjustable interest rate I will pay may change on that
day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable
interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

**MULTISTATE FIXED/ADJUSTABLE RATE RIDER - ONE-YEAR TREASURY INDEX- Single Family -
Fannie Mae Uniform Instrument**

**VMP-843R** (0006)   Form 3182 1/01
Page 1 of 4       Initials: _____
VMP MORTGAGE FORMS - (800)521-7291

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND THREE-QUARTERS** percentage points ( **2.750** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **10.375** % or less than **2.750** %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **10.375** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Initials: _JO CSS_

VMP-843R (0006)          Page 2 of 4          Form 3182 1/01

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all

Initials: _____

VMP-843R (0006)                          Page 3 of 4                          Form 3182 1/01

sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)          _____ (Seal)
RAFAEL AGLIATA          -Borrower          CHRISTINE B SHEEHAN          -Borrower

_____ (Seal)          _____ (Seal)
          -Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
          -Borrower                              -Borrower

_____ (Seal)          _____ (Seal)
          -Borrower                              -Borrower

-843R (0006)                    Page 4 of 4                    Form 3182 1/01

Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future. If Lender accepts such payments, it shall apply such payments at the time such payments are accepted. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts



due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: 

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable



attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

Initials: _____

**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: 

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the



new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: ____ CBS

-6(NJ) (0005).01                          Page 12 of 15                          Form 3031 1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property; (e) the Borrower's right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure; and (f) any other disclosure required under the Fair Foreclosure Act, codified at Sections 2A:50-53 et seq. of the New Jersey Statutes, or other Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence permitted by Rules of Court.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. No Claim of Credit for Taxes.** Borrower will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. Borrower will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

Initials: CBS

VMP -6(NJ) (0005).01                     Page 13 of 15                     Form 3031 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____

Ted Del Guorcio, Esq.

_____ (Seal)
RAFAEL AGLIATA                                         -Borrower

_____

Ted Del Guorcio, Esq.

_____ (Seal)
CHRISTINE B SHEEHAN                              -Borrower

_____ (Seal)
                                                               -Borrower

_____ (Seal)
                                                               -Borrower

_____ (Seal)
                                                               -Borrower

_____ (Seal)
                                                               -Borrower

_____ (Seal)
                                                               -Borrower

_____ (Seal)
                                                               -Borrower

VMP®-6(NJ) (0005).01                    Page 14 of 15                    Form 3031 1/01

STATE OF NEW JERSEY,                MiDDLESEX                County ss:

On this    2 3    day of    December , 200 3    , before me, the subscriber,
personally appeared RAFAEL AGLIATA AND CHRISTINE B SHEEHAN

who, I am satisfied,
is/are the person(s) named in and who executed the within instrument, and thereupon acknowledged that
he/she/they signed, sealed and delivered the same as his/her/their act and deed, for the purposes therein
expressed.

_____
Notary Public

Ted Del Guercio, Esq.
ATTorney-aT-Law
New Jersey.

Initials: ____ CBS

VMP -6(NJ) (0005).01          Page 15 of 15          Form 3031 1/01

**END OF DOCUMENT**

**Freddie Mac**

We make home possible℠

## BROKER'S PRICE OPINION

Freddie Mac Loan # ████████

| | | |
|---|---|---|
| Exterior /Curb Side ☒ | Inspection Date 03/15/2016 | Servicer Loan # ████████ |
| Interior ☐ | | |
| Interior Access Denied ☐ | Reason | BPO # 44343515 |

| BPO Firm Name | Broker | Phone |
|---|---|---|
| PREFERRED PROPERTIES GRO | JOE EVANGELISTI | (856) 685-5617 |

### SUBJECT PROPERTY DESCRIPTION

| Property Address 44 MARTIN LANE | | Unit # |
|---|---|---|

| City HAMILTON | County | State NJ | Zip 08619 |
|---|---|---|---|

| Is property currently listed for sale with a real estate firm? ☐ Yes ☒ No | Name of Listing Broker, Salesperson or Firm | Phone |
|---|---|---|

| Property Type: Single Family | Condo Fee $ 0 |
|---|---|

Occupant: ☒ Owner  ☐ Tenant  ☐ Vacant

### Estimate of repairs needed for subject property

| Interior: | | Exterior: | |
|---|---|---|---|
| Painting | $ 0 | Painting | $ 0 |
| Structural | $ 0 | Structural | $ 0 |
| Appliances | $ 0 | Landscaping | $ 0 |
| Utilities | $ 0 | Roof | $ 0 |
| Carpet/Floors | $ 0 | Windows | $ 0 |
| Other | $ 0 | Other | $ 0 |
| Cleaning/Trash Removal | $ 0 | Do you recommend repairs? ☐ Yes ☒ No | |

Repairs Total: $ 0.00

---

| Overall Property Condition: ☐ Excellent ☒ Good ☐ Fair ☐ Poor | |
|---|---|
| Are there any items that require IMMEDIATE attention/action? ☐ Yes ☒ No | |
| Title/Legal Issues? ☐ Yes ☒ No | |
| Do any environmental issues affect the value of the property? ☐ Yes ☒ No | |
| If yes to any of the above, please explain: | |

AS PER RECORD, THERE ARE NO RECORDED UPGRADES/UPDATES IN COUNTY TAX RECORD OR MLS.\N

---

### NEIGHBORHOOD

| Property Values: ☐ Increasing ☒ Stable ☐ Declining | Predominant Occupancy ☒ Owner ☐ Tenant |
|---|---|
| Marketing Time: ☐ Under 3 Mos. ☒ 3-6 Mos. ☐ Over 6 Mos. | Vacancy Rate ☒ 0-5% ☐ 5-10% ☐ 10-20% ☐ 20% + |

| No. of Active Listings in Neighborhood: 8 | Price Range of Active Listings in Neighborhood:$ 360000 to $ 400000 |
|---|---|

COMMENTS SUBJECT IS IN AVERAGE CONDITION AND CONFORMS TO NEIGHBORHOOD CHARACTERISTICS.
REO AND SHORT SALE ARE PRESENT IN AREA BUT NEIGHBORHOOD IS NOT REO DRIVEN.
PROPERTY VALUES IN SUBJECT AREA IS AS PER COMPARABLE SEARCH.\N

---

### VALUE ESTIMATION

| Probable Sale Price | 90-Day Marketing Time | 120-Day Marketing Time | 180-Day Marketing Time |
|---|---|---|---|
| As Is | 385000 | 385000 | 385000 |
| As Repaired | 385000 | 385000 | 385000 |

Property should be listed: As Is: ☒  As Repaired: ☐

Anticipated Seller-Paid Financing Costs: $ 0

COMMENTS: (Describe your marketing strategy and reasons for As Is/As Repaired recommendations)
THE MARKET PRICE OPINION AS OF TODAY IS $385000. THE TYPICAL MARKETING TIME IS 120 DAYS.

---

| PREPARED BY: /S/ JOE EVANGELISTI | |
|---|---|
| Signature | Date 03/17/2016 |

**THIS IS AN OPINION OF PRICE OR COMPARATIVE MARKET ANALYSIS AND IS NOT AN APPRAISAL.** This opinion does not adhere to the guidelines for development of an appraisal or analysis contained in the Uniform Standards of Professional Practice of the Appraisal Foundation. This opinion may have been developed in connection with a loss mitigation request made by you. If so, this opinion is being provided to you on behalf of your servicer and the Federal Home Loan Mortgage Corporation. Your servicer may have also used a different or additional property value or price to make a loss mitigation decision. If you have questions, please visit Freddie Mac's website at http://www.freddiemac.com/valuation.

| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 44 MARTIN LANE | 20 CAVALIER DR | | 56 DEACON DR | | 17 EMILY PL | |
| Proximity to Subject | | 3/4 Miles | | 3/4 Miles | | 2 Miles | |
| Current List Price | $ | $ 377000 | | $384900 | | $ 399900 | |
| Current List Date | | 03/03/2016 | | 03/14/2016 | | 03/15/2016 | |
| Original List Price | $ | $ 377000 | | $ 384900 | | $ 399900 | |
| Original List Date | | 02/25/2016 | | 03/14/2016 | | 12/09/2015 | |
| VALUE ADJUSTMENTS (Use the following codes for the adjustments: S=Superior E=Equal I=Inferior U=Unknown) | | | | | | | |
| DESCRIPTION | DESCRIPTION | DESCRIPTION | ADJ | DESCRIPTION | ADJ | DESCRIPTION | ADJ |
| Above Grade Room Count | Total # of Rooms 11 Bdrm 4 Baths 2.5 | Total # of Rooms 9 Bdrm 4 Baths 2.5 | | Total # of Rooms 12 Bdrm 4 Baths 2.5 | | Total # of Rooms 10 Bdrm 4 Baths 2.5 | |
| Gross Living Area | Sq. Ft. 2795 | Sq. Ft. 2752 | Code | Sq. Ft. 2524 | Code | Sq. Ft. 2532 | Code |
| Location | FAIR | FAIR | E | FAIR | E | FAIR | E |
| Site/Lot Size | 0.35AC | 0.40AC | E | 0.48AC | E | 0.23AC | E |
| Design and Appeal | SINGLE FAMILY | SFD | E | SFD | E | SFD | E |
| Age (number of yrs. since house was built) | 26 | 31 | E | 40 | I | 16 | E |
| Overall Condition | Good | Good | E | Good | E | Good | E |
| Garage/Carport | 2 Attached | 2 Attached | E | 2 Attached | E | 2 Detached | E |
| Porch, Patio Deck, Pool, Fence | FIREPLACE | 0 | E | 0 | E | 0 | E |
| Overall Rating/Est.$ Value of Adjustments | | 0 | E | 1400 | I | 0 | E |
| Indicate Property Most Comparable to Subject (Check One) | | ☒ | | ☐ | | ☐ | |
| COMMENTS: 1)SIMILAR IN STYLE AND LOCATED IN SAME AREA.2)COMPARABLE IS INFERIOR IN AGE. LOCATED IN SAME AREA.3)SIMILAR IN STYLE, SUPERIOR IN AGE. | | | | | | | |

| CLOSED SALES | | | | | | | |
|---|---|---|---|---|---|---|---|
| ITEM | SUBJECT | COMPARABLE NO. 1 | | COMPARABLE NO. 2 | | COMPARABLE NO. 3 | |
| Address | 44 MARTIN LANE | 4 VALLEY RD | | 15 MORO DR | | 178 APPLEGATE DR | |
| Proximity to Subject | | 5+ Miles | | 5+ Miles | | 5+ Miles | |
| Original List Price | $ | $ 399900 | | $ 385000 | | $424900 | |
| List Price When Sold | $ | $ 399000 | | $ 385000 | | $410000 | |
| Sales Price | $ | $ 370000 | | $ 380000 | | $ 390000 | |
| Sales Date | | 02/17/2016 | | 09/18/2015 | | 09/28/2015 | |
| Days on Market | | 61 | | 22 | | 142 | |
| VALUE ADJUSTMENTS (Use the following codes for the adjustments: S=Superior E=Equal I=Inferior U=Unknown) | | | | | | | |
| DESCRIPTION | DESCRIPTION | DESCRIPTION | ADJ | DESCRIPTION | ADJ | DESCRIPTION | ADJ |
| Above Grade Room Count | Total # of Rooms 11 Bdrm 4 Baths 2.5 | Total # of Rooms 9 Bdrm 4 Baths 1.5 | | Total # of Rooms 10 Bdrm 4 Baths 2.5 | | Total # of Rooms 9 Bdrm 4 Baths 2.5 | |
| Gross Living Area | Sq. Ft. 2795 | Sq. Ft. 2700 | Code | Sq. Ft. 2658 | Code | Sq. Ft. 2716 | Code |
| Sales or Financing Concessions | | 0 | E | 0 | E | 0 | E |
| Location | FAIR | FAIR | E | FAIR | E | FAIR | E |
| Site/Lot Size | 0.35AC | 0.86AC | S | 0.22AC | E | 0.37AC | E |
| Landscaping | Fair | Fair | E | Fair | E | Fair | E |
| Design and Appeal | SINGLE FAMILY | SFD | E | SFD | E | SFD | E |
| Age (number of yrs. since house was built) | 26 | 35 | E | 37 | I | 22 | E |
| Overall Condition | Good | Good | E | Good | E | Good | E |
| Garage/Carport | 2 Attached | 3 Attached | S | 2 Attached | E | 2 Attached | E |
| Porch, Patio Deck, Pool, Fence | FIREPLACE | 0 | E | 0 | E | 0 | E |
| Overall Rating/Est.$ Value of Adjustments | | -2275 | S | 1100 | I | 0 | E |
| Indicate Property Most Comparable to Subject (Check One) | | ☐ | | ☐ | | ☒ | |
| COMMENTS: 1)SUPERIOR IN GARAGE AND LOT. INFERIOR IN AGE 2)COMPARABLE IS INFERIOR IN AGE. SIMILAR IN GARAGE COUNT3)SIMILAR IN STYLE AND AGE. LOCATED IN SAME AREA. | | | | | | | |

**BPOdirect Addendum**

**BPOdirect Order #:**  44343515          **Project Code:** _____

**FM Loan Number:** ▉▉▉▉▉▉          **SS Loan Number:** ▉▉▉▉▉▉___

**Property Address:** 44  MARTIN LANE, HAMILTON, NJ, 08619

**Comments:**

HTTPS://WWW.EMORTGAGELOGIC.COM/PDOCS/BDB3844105.HTML
SUBJECT IS A 2 STORY SINGLE FAMILY DETACHED WITH 4 BEDROOMS
AND 1.5 BATHROOMS ON A 0.35 ACRE LOT LOCATED IN HAMILTON,
VERIFICATION DETAIL USED ARE TAX RECORD AND MLS. FEATURING 2
CAR GARAGE ATTACHED. SUBJECT IS IN AVERAGE CONDITION AND IN
NO NEED OF IMMEDIATE REPAIRS BASING FROM THE EXTERIOR
INSPECTION MADE. SUBJECT RECOMMENDED PRICE IS BASED FROM
SOLD COMPARABLE ADJUSTED VALUE. \N\N OTHER ADJUSTMENTS: CS1
PATIO 0, CS2 DECK. PORCH 0, CS3 NONE 0, CL1 DECK 0, CL2 PATIO,
PORCH 0, CL3 FIREPLACE 0  EXACT
MILEAGE-SC1:41.47MI,SC2:11.45MI,SC3:32.97MI,LC1:3/4 MILES,LC2:3/4
MILES,LC3:1.75 MILES
ADJ-SC1:-1275LOTSIZE,-1000GAR
ADJ-SC2:1100YRBLT
ADJ-SC3
ADJ-LC1
ADJ-LC2:1400YRBLT
ADJ-LC3

**Comments, cont:**

**Comments, cont:**

*Order 44343515, FRONT_1.JPG*



*Order 44343515, ADDR_VERIFICATION_1.JPG*





*Order 44343515, SIDE_1.JPG*



*Order 44343515, ACROSS_STREET_1.JPG*

